**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| UNIVERSITY OF PUERTO RICO RETIREMENT SYSTEM, | Case No.    15-CV-8484 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| BANK OF NOVA SCOTIA, NEW YORK AGENCY; BARCLAYS CAPITAL INC.; BMO CAPITAL MARKETS CORP.; BNP PARIBAS SECURITIES CORP.; CANTOR FITZGERALD & CO.; CIBC WORLD MARKETS CORP.; CITIGROUP GLOBAL MARKETS INC.; COMMERZ MARKETS LLC; COUNTRYWIDE SECURITIES CORPORATION; CREDIT SUISSE SECURITIES (USA) LLC; DAIWA CAPITAL MARKETS AMERICA INC.; DEUTSCHE BANK SECURITIES INC.; GOLDMAN, SACHS & CO.; HSBC SECURITIES (USA) INC.; JEFFERIES LLC; J.P. MORGAN SECURITIES LLC; MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED; MIZUHO SECURITIES USA INC.; MORGAN STANLEY & CO. LLC; NOMURA SECURITIES INTERNATIONAL, INC.; RBC CAPITAL MARKETS, LLC; RBS SECURITIES INC.; SG AMERICAS SECURITIES, LLC; TD SECURITIES (USA) LLC; and UBS SECURITIES LLC, | |
| Defendants. | |

1.     Plaintiff University of Puerto Rico Retirement System ("Plaintiff"), on behalf of itself and all others similarly situated, brings this class action for violations of the Sherman Act, Clayton Act, Commodity Exchange Act, and state common law against Defendants, each of whom is or was a Primary Dealer (as defined herein) in Treasury Securities (as defined herein) during January 1, 2007 through the present, inclusive (the "Class Period"). The allegations are based upon personal knowledge as to Plaintiff and Plaintiff's own acts and upon counsel's investigation, information, and belief as to all other matters. Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

2.     This class action arises from Defendants' collusive manipulation of the market for U.S. Treasury bills, notes, and bonds (collectively, "Treasury Securities"), as well as derivative financial products related to Treasury Securities, such as futures and options (together with Treasury Securities, "Treasury Instruments"). Treasury Securities are debt instruments issued by the U.S. Treasury Department ("Treasury Department") to help finance the operations and debt of the U.S. federal government. Treasury Securities and related derivative financial products are used by state and local municipalities, corporations, investment funds, hedge funds, pension funds, and individuals for investing and hedging purposes. Prices of Treasury Securities serve as a worldwide benchmark for borrowers and savers, helping to determine credit rates throughout the global economy. As of June 2015, the Treasury Securities market was estimated to be $12.5 trillion.

3.     Defendants, by virtue of their positions as Primary Dealers in the market for Treasury Securities, have a special obligation to ensure the efficient function of this market.

1

Instead of fulfilling this obligation, Defendants colluded to manipulate Treasury Department auctions for Treasury Securities as well as the pricing of Treasury Securities in the "when-issued market"—*i.e.*, the period between the auction announcement date and the issuance (delivery) of the auctioned securities.

4.      The when-issued market for Treasury Securities takes place during the seven days leading up to the Treasury Department auction, but also includes a few days between the auction and the ultimate issuance of the securities.  During the pre-auction part of this period, entities including Defendants, pension funds, investment funds, hedge funds, and other types of investors can trade in the Treasury securities that are to be auctioned.  Typically, Defendants act as sellers of Treasury Securities to their customers during the when-issued market.  Then, at auction, Defendants become buyers of the Treasury securities in order to cover the sales they made during the when-issued market.  The difference between the price at which Defendants sell in the when-issued market and the purchase at auction, or spread, is Defendants' profit.  Defendants' conspiracy caused these profits to be "supracompetitive" – i.e., profits generated from pricing that was not sustainable in a competitive market.

5.      As alleged herein, Defendants colluded and schemed to manipulate the Treasury Securities market by: (1) sharing confidential customer information and coordinating trading strategies to increase the bid-ask spread in the when-issued market to inflate the prices of the Treasury Securities they sold; and (2) manipulating the Treasury auction bidding process to deflate prices at which they bought Treasury Securities to cover their pre-auction sales.  Recent investigative reports confirm that Defendants' traders "talked with counterparts at other banks via online chatrooms" and "swapped gossip about clients' Treasury orders."[1]

---

[1] Keri Geiger, Daniel Kruger, and Alexandra Scaggs, *As U.S. Probes $12.7 Trillion Treasury Market, Trader Talk is a Good Place to Start*, BLOOMBERG BUSINESS, June 24, 2015.

6.      As a result of Defendants' unlawful manipulation of the Treasury Securities markets, the prices of when-issued Treasury Securities were artificially high and the prices of Treasury Securities at auction were artificially low.  Defendants' conduct maximized profits at the expense of their customers and others in the market.  Moreover, this collusion affected the prices of other Treasury Instruments, such as futures and options, thereby harming still more investors.

7.      The Department of Justice ("DOJ") recently opened an investigation into the market for Treasury Instruments.  Recent reports state that the DOJ has sent requests for information to at least three banks in connection with its investigation.  The investigation follows on the heels of its broader investigation into anticompetitive conduct in various financial product markets and benchmarks, including, among others, LIBOR, foreign exchange, and ISDAFIX.

8.      Plaintiff brings this action for claims under the federal antitrust and commodities laws to recover damages, injunctive relief, and other relief for the substantial injuries that Plaintiff and others similarly situated have sustained as a result of Defendants' unlawful conduct to restrain competition in the market for Treasury Instruments in the United States during the Class Period.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26), Section 22 of the Commodity Exchange Act (7 U.S.C. §25), and pursuant to 28 U.S.C. §§ 1331 and 1337(a).

10.      This Court has personal jurisdiction over each Defendant, because each Defendant transacted business throughout the United States, including in this District; had substantial contacts with the United States, including in this District; and/or committed overt acts

in furtherance of their illegal scheme and conspiracy in the United States. In addition, the conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District, and Plaintiff's claims arise out of Defendants' conduct.

11.     Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. §§ 15(a), 22, and 28 U.S.C. §1391(b), (c), (d) because during the Class Period all Defendants who resided, or transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

12.     This Court has *in personam* jurisdiction over each Defendant because each Defendant, either directly or through the ownership and/or control of its United States subsidiaries, did the following: (a) transacted business in the United States, including in this District; (b) had substantial aggregate contacts with the United States as a whole, including in this District; (c) was engaged in a price-fixing conspiracy that had an effect on commerce in the United States, including in this District; or (d) purposefully availed itself of the laws of the United States.

13.     The activities of Defendants and their co-conspirators were within the flow of, were intended to, and had a substantial effect on, the foreign and interstate commerce of the United States.

## PARTIES

### A.     Plaintiff

14.     Plaintiff University of Puerto Rico Retirement System ("Plaintiff") provides pension and other benefits to retired employees of the University of Puerto Rico.  During the

Class Period, Plaintiff directly transacted in Treasury Instruments with at least one or more of the Defendants.  As a direct and proximate result of Defendants' collusive, anticompetitive, and manipulative activities, Plaintiff suffered injury to its business or property.

### B. Defendants

15.     Defendant Bank of Nova Scotia, New York Agency ("BNS") is a New York-based branch of a Canadian financial services and banking company with its principal place of business at 250 Vesey Street, New York, New York 10080.  BNS is a registered primary dealer for Treasury securities with the Federal Reserve Bank of New York ("FRBNY").

16.     Defendant Barclays Capital Inc. ("Barclays") is a New York-based financial services company with its principal place of business at 745 Seventh Avenue, New York, New York 10019.  Barclays operates as a subsidiary of Barclays Group US, Inc.  Barclays is a registered primary dealer for Treasury securities with the FRBNY.

17.     Defendant BMO Capital Markets Corp. ("BMO") is a New York-based financial services and banking company with its principal place of business at 3 Times Square, 28th Floor, New York, New York 10036.  BMO operates as a subsidiary of BMO Financial Corp.  BMO is a registered primary dealer for Treasury securities with the FRBNY.

18.     Defendant BNP Paribas Securities Corp. ("BNP") is a New York-based financial services company with its principal place of business at 787 Seventh Avenue, New York, New York 10019.  BNP operates as a subsidiary of BNP Paribas North America Inc.  BNP is a registered primary dealer for Treasury securities with the FRBNY.

19.     Defendant Cantor Fitzgerald & Co. ("Cantor") is a New York-based financial services company with its principal place of business at 499 Park Avenue, New York, New York 10022.  Cantor operates as a subsidiary of Cantor Fitzgerald LP.  Cantor is a registered primary dealer for Treasury securities with the FRBNY.

20.     Defendant CIBC World Markets Corp. ("CIBC") is a Delaware corporation with its principal offices at 300 Madison Avenue, New York, New York 10017.  CIBC served as a primary dealer for Treasury securities during the Class Period.

21.     Defendant Citigroup Global Markets Inc. ("Citigroup") is a New York-based financial services company with its principal place of business at 390-388 Greenwich Street, New York, New York 10013.  Citigroup operates as a subsidiary of Citigroup Financial Products Inc.  Citigroup is a registered primary dealer for Treasury securities with the FRBNY.

22.     Defendant Commerz Markets LLC ("Commerz"), formerly known as Dresdner Kleinwort Securities LLC, is a Delaware corporation with its principal offices at 2 World Financial Center, New York, New York 10281.  During the Class Period, Commerz, under its former name, served as a primary dealer for Treasury securities.

23.     Defendant Countrywide Securities Corporation ("Countrywide") is a financial services company with its principal place of business at 4500 Park Granada, Calabasas, California 91302. Countrywide operates as a subsidiary of Countrywide Capital Markets, LLC, which in turn operates as a subsidiary of Bank of America Corporation. During the Class Period, Countrywide served as a primary dealer of Treasury Securities.

24.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is a New York-based financial services company with its principal place of business at 11 Madison Avenue, 24th Floor, New York, New York 10010.  Credit Suisse operates as a subsidiary of Credit Suisse (USA), Inc.  Credit Suisse is a registered primary dealer for Treasury securities with the FRBNY.

25.     Defendant Daiwa Capital Markets America Inc. ("Daiwa") is a New York-based financial services company with its principal place of business at Financial Square, 32 Old Slip, New York, New York 10005.   Daiwa operates as a subsidiary of Daiwa Capital Markets

6

America Holdings Inc.  Daiwa is a registered primary dealer for Treasury securities with the FRBNY.

26.      Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") is a New York-based investment bank with its principal place of business at 60 Wall Street, 4th Floor, New York, New York 10005.  Deutsche Bank operates as a subsidiary of DB U.S. Financial Markets Holding Corporation.  Deutsche Bank is a registered primary dealer for Treasury securities with the FRBNY.

27.      Defendant Goldman, Sachs & Co. ("Goldman") is a New York-based financial services company with its principal place of business at 200 West Street, 29th Floor, New York, New York 10282.  Goldman operates as a subsidiary of The Goldman Sachs Group Inc. Goldman is a registered primary dealer for Treasury securities with the FRBNY.

28.      Defendant HSBC Securities (USA) Inc. ("HSBC") is a New York-based investment banking firm with its principal place of business at HSBC Tower, 452 Fifth Avenue, New York, New York 10018.  HSBC operates as a subsidiary of HSBC Investments (North America) Inc.  HSBC is a registered primary dealer for Treasury securities with the FRBNY.

29.      Defendant Jefferies LLC ("Jefferies") is a New York-based financial services company with its principal place of business at 520 Madison Avenue, 10th Floor, New York, New York 10022.  Jefferies operates as a subsidiary of Jefferies Group LLC. Jefferies is a registered primary dealer for Treasury securities with the FRBNY.

30.      Defendant J.P. Morgan Securities LLC ("JPMorgan") is a New York-based financial services company with its principal place of business at 277 Park Avenue, New York, New York 10172.  JPMorgan operates as a subsidiary of JPMorgan Chase & Co. JPMorgan is a registered primary dealer for Treasury securities with the FRBNY.

31.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is a New York-based financial services company with its principal place of business at One Bryant Park, New York, New York 10036.  Merrill Lynch operates as a subsidiary of BAC North America Holding Company.  Merrill Lynch is a registered primary dealer for Treasury securities with the FRBNY.

32.     Defendant Mizuho Securities USA Inc. ("Mizuho") is a New York-based financial services company with its principal place of business at 320 Park Avenue, 12th Floor, New York, New York 10022.  Mizuho operates as a subsidiary of Mizuho Securities Co., Ltd. Mizuho is a registered primary dealer for Treasury securities with the FRBNY.

33.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is a New York-based financial services company with its principal place of business at 1585 Broadway, New York, New York 10036.  Morgan Stanley operates as a subsidiary of Morgan Stanley Domestic Holdings, Inc. Morgan Stanley is a registered primary dealer for Treasury securities with the FRBNY.

34.     Defendant Nomura Securities International Inc. ("Nomura") is a New York-based financial services company with its principal place of business at 309 West 49th Street Worldwide Plaza, New York, New York 10019.  Nomura operates as a subsidiary of Nomura Holding America, Inc.  Nomura is a registered primary dealer for Treasury securities with the FRBNY.

35.     Defendant RBC Capital Markets, LLC ("RBC") is a Canadian financial services company organized as a Minnesota LLC.  RBC has a principal place of business  at 3 World Financial Center, 200 Vesey Street, 8th Floor, New York, New York 10281 and at One Liberty

Plaza, 165 Broadway, New York, New York 10006.  RBC operates as a subsidiary of RBC USA Holdco Corporation.  RBC is a registered dealer for Treasury securities with the FRBNY.

36.     Defendant RBS Securities Inc. ("RBS") is a Connecticut-based financial services company with its principal place of business at 600 Washington Boulevard, Stamford, Connecticut 06901.  RBS operates as a subsidiary of RBS Holdings USA Inc. RBS is a registered primary dealer for treasury securities with the FRBNY.

37.     Defendant SG America Securities, LLC ("SG") is a New York-based financial services company with its principal place of business at 1221 Avenue of the Americas, 6th Floor, New York, New York 10020.  SG operates as a subsidiary of SG Americas Securities Holdings, LLC, which itself is a subsidiary of Societe Generale Group.  SG is a registered primary dealer for Treasury securities with the FRBNY.

38.     Defendant TD Securities (USA) LLC ("TD Securities") is a New York-based financial services company with its principal place of business at 31 West 52nd Street, New York, New York 10019.  TD Securities operates as a subsidiary of TD Holdings II Inc. TD Securities is a registered primary dealer for Treasury securities with the FRBNY.

39.     Defendant UBS Securities LLC ("UBS") is a Connecticut-based financial services company with its principal place of business at 677 Washington Boulevard, Stamford, Connecticut 06901.  UBS operates as a subsidiary of UBS Americas Inc. UBS is a registered primary dealer for Treasury securities with the FRBNY.

40.     Various other entities and individuals unknown to Plaintiff at this time – including other major Treasury securities dealers – participated as co-conspirators in the acts complained of, and performed acts and made statements that aided and abetted and were in furtherance of the

unlawful conduct alleged herein.  Plaintiff reserves the right to identify such persons and entities as additional defendants.

<strong>FACTUAL BACKGROUND</strong>

**A.      The Treasury Securities Market**

41.      Treasury Securities are debt instruments issued by the Treasury Department.  The market for Treasury Securities is one of the largest and most active debt securities markets in the world.  As of June 2015, the Treasury Securities market was estimated to be $12.5 trillion.

42.      There are a number of different types of Treasury Securities, including bills, notes, bonds, Treasury Inflated Protected Securities ("TIPS"), cash management bills ("CMBs"), and Floating Rate Notes ("FRNs") – each with maturities of varying lengths:

- Bills mature in one year or less, do not pay interest prior to maturity, and are sold at a discount to par values.

- Notes mature in 2 to 10 years and make a coupon payment every 6 months.

- Bonds have the longest maturity, more than 10 years, are currently offered in a 30-year maturity, and make a coupon payment every 6 months.

- TIPS are currently offered in 5-, 10-, and 30-year maturities and make a coupon payment every 6 months.  The principal amounts of TIPS are adjusted to the Consumer Price Index, a commonly used measure for inflation.  Therefore, TIPS coupon payments increase when inflation increases and decrease when inflation decreases.

- CMBs are occasionally offered to meet short-term needs and are usually set on an issue-by-issue basis to typically run from one day to one year.

10

- FRNs are currently offered in a 2-year maturity and pay a quarterly coupon that is indexed to the rate of the most-recent 13-week bills offering. Therefore, FRN coupon payments increase and decrease based on interest-rate movement.

43. In addition to Treasury Securities themselves, other derivative financial products based on Treasury Securities ("Treasury Instruments") are traded on the Chicago Mercantile Exchange ("CME"), the most common of which are futures and options. Prices for futures and options are necessarily influenced heavily by prices of the underlying Treasury Securities.

- Futures are instruments that obligate the buyer or seller to buy or sell Treasury Securities at a predetermined future date and price;

- Options are instruments that give the holder the right to enter into a specified futures contract with respect to Treasury Securities.

44. The rates attached to the sale of Treasury Securities affect a range of borrowing costs and credit rates, including home mortgages, auto loans, credit cards, student loan debts, corporate bonds, and state and local bonds. Moreover, Treasury Securities are considered to be the most easily traded and trusted debt in the world, with trillions of dollars invested by foreign countries into these securities every year, as well as by U.S. investment firms, pension and retirement funds, hedge funds, nonprofit organizations, individual and other investors.

**B.   Primary Dealers**

45. Each of the Defendants served as a Primary Dealer during the Class Period. Primary Dealers are the largest group of buyers at Treasury Securities auctions and are active in buying and selling U.S. Government securities. They are either (i) U.S.-chartered banks (commercial banks, thrifts, national banks, or state banks) subject to official supervision by bank supervisors or (ii) broker-dealers registered with and supervised by the SEC. Primary Dealers

11

serve as trading counterparties of the FRBNY in its implementation of monetary policy and are required to participate in all Treasury Securities auctions and to make reasonable markets for the FRBNY when it transacts on behalf of its foreign official accountholders.  Many of the Treasury Securities bought by Primary Dealers at auctions will later be sold and resold on the secondary market to companies, banks, other dealers, and individuals.  Accordingly, Primary Dealers form a worldwide network that distributes new U.S. government debt.

46.     The FRBNY mandates that in every Treasury Securities auction, each Primary Dealer bids for—at a minimum—an amount of securities representing its *pro rata* share of the offered amount based on the number of Primary Dealers at the time of the auction; and, that a Primary Dealer's bid prices should be reasonable when compared to the range of rates trading in the when-issued market, taking into account market volatility and other risk factors.  The FRBNY expects Primary Dealers to act as responsible counterparties and market participants in their overall support of market efficiency and liquidity.  Finally, the FRBNY expects a Primary Dealer to maintain robust compliance programs, including procedures to identify and mitigate legal, regulatory, financial, and reputational risks.

47.     As stated by Simon Potter, Executive Vice President of the FRBNY, Primary Dealers "play an integral role as the Federal Reserve's counterparties in operations to implement monetary policy, as participants in U.S. Treasury auctions, and as important providers of information on market developments to support the [FRBNY] Desk's monitoring of financial markets."[2]

---

[2] Simon Potter, Remarks at the 2015 Primary Dealer Meeting: "Challenges Posed by the Evolution of the Treasury Market, New York City, April 13, 2015, available at http://www.newyorkfed.org/newsevents/speeches/ 2015/ pot150413.html.

48.     As purchasers of Treasury Securities both on their own behalf and on behalf of third parties, the institutions serving as Primary Dealers are, collectively, in a unique, privileged position to access order information relating to any issuance of Treasury Securities.

**C.     The Treasury Auction Process**

49.     Treasury Securities are purchased at public auction(s) held by the Treasury Department.   While the specific details vary based on the type of Treasury Security up for auction, Treasury Securities auctions are conducted on regular and predictable schedule.   The Treasury announces the auction at least several days in advance, along with the amount of Treasury Securities up for auction, the issue or original issuance date, the maturity date, the terms and conditions of the offering, the customers eligible to participate, noncompetitive and competitive bidding time, and other relevant information.

50.     Bids may be submitted, as soon as an auction is announced, primarily through the Treasury Automated Auction Processing System ("TAAPS"), although a smaller volume of Treasury Securities is purchased by individual investors directly from the Treasury Department through its TreasuryDirect website.   Investors without access to either TAAPS or TreasuryDirect can bid through broker-dealers or through depository institutions that have access to TAAPS.

51.     There are two types of bids: non-competitive and competitive.   Noncompetitive bids are generally submitted by small investors and individuals who agree to accept the rate, yield, or discount margin that is determined at the auction.   Non-competitive bids are guaranteed to receive Treasury Securities, although the amount is limited to $5 million per auction per single bidder.

52.     Competitive bids, by contrast, are usually submitted by large financial institutions, typically Primary Dealers, for their own accounts or for their customers.   In competitive bidding, bidders specify the rate, yield, or discount margin that the bidder will

accept.  Competitive bidders are restricted to receiving no more than 35% of the total amount of

Treasury Securities being auctioned to ensure that the secondary market for Treasury Securities

remains competitive.  Many of the Treasury Securities bought by Primary Dealers are later sold

and resold on the secondary market to companies, banks, other dealers, and individuals.

53.     Winning bids are determined by first subtracting the non-competitive bids from

the offering amount to determine the amount of Treasury Securities available for competitive

bidders.  Treasury Securities are then allocated to the competitive bidders based on either the

discount rate (in the case of bills) or yield rate (in the case of notes, bonds, FRNs, and TIPS).

54.     Upon completion of the auction, the Treasury Department publishes certain

limited information about the results of the auction, including: (1) the interest rate; (2) the price;

(3) the highest yield offered; (4) percentage of Treasuries allotted at the high yield; (5) the

median yield offered; (6) the low yield offered; (7) aggregate figures of bids tendered and

accepted at both competitive and non-competitive auctions; and (8) figures breaking down the

bids tendered and accepted based on bidder type (e.g. primary dealer, direct bidder, and indirect

bidder).  The specific institutions to whom the securities are allocated or the auction participants’

bids are not identified to the public.

**D.      The When-Issued Market**

55.     As soon as the Treasury Department announces the details of an upcoming

auction, there is an active market for the to-be issued or “when-issued” Treasury Securities.  This

when-issued market takes place between the date of the announcement of the auction and

continues through the date the Treasury Department issues, or delivers, the auctioned securities.

56.     In the when-issued market, dealers and direct bidders execute trades amongst

themselves or their customers for the placement of when-issued Treasury Securities after the

completion of the auction.  If a trader, investor, or dealer takes a short position during the when-

issued period, it must be able to cover its short position by obtaining the necessary Treasury Securities during the auction or through another source in the secondary market so that it can deliver the Treasury Securities to the counterparty going long (*i.e.*, taking delivery of the security).  The short seller makes a profit on their short positions if they can obtain Treasuries from the Treasury Department auction (or secondary market) at a lower price than it agreed to sell it at in the when-issued market and deliver to its counterparty going long.

57.     In a truly competitive market, Primary Dealers are likely to have difficulty profiting on short positions because prices of Treasury Securities are generally lower in the when-issued market than at auction.  Consequently, the Treasury Department auctions Treasury Securities to Primary Dealers at a discount, so that the Primary Dealers can make a profit selling, and thus have an incentive to sell, to counterparties.

## DEFENDANTS' UNLAWFUL CONDUCT

58.     Throughout the Class Period, Defendants abused their position as Primary Dealers and engaged in systemic collusion aimed at manipulating the market for Treasury Securities.  As Primary Dealers, Defendants receive a significant volume of material non-public information regarding their clients' orders before auction results are publicly known.  By exchanging confidential customer information with one another, Defendants were able to coordinate their trading strategies: (i) to artificially inflate the prices of Treasury Securities sold in the when-issued market through coordination of bid-ask spreads; and (ii) subsequently to manipulate the auction bidding to artificially deflate the prices at which they purchased Treasury Securities to cover orders placed pre-auction in the when-issued market.  As a result, Defendants were able to maximize their own profits, at the expense of investors in Treasury Securities and Instruments, thereby causing damage to the Class.

15

59.     On or around June 8, 2015, the media reported that the DOJ's Antitrust Division was probing Primary Dealers for potential collusion in setting prices for Treasury Securities, including whether information was being shared improperly in submitting competitive bids.[3]

60.     On June 24, 2015, Bloomberg Business reported that, hours ahead of auctions of Treasury Securities, traders at Primary Dealers obtained detailed information from Primary Dealers' salespeople about billions-of-dollars-worth of bids by their clients.[4]   Similarly, traders at Primary Dealers frequently exchanged information with their counterparts at other Primary Dealers regarding their clients' orders for Treasury Securities through online chat rooms.   By "swapp[ing] gossip about clients' Treasury [Securities] orders," traders at primary dealers "gained information useful for making bets on one of the most powerful drivers of global markets."[5]

61.     The exchange of the competitively-sensitive information between and among Defendants allowed Defendants to coordinate bidding strategies in the when-issued market and Treasury auctions.   By artificially increasing the spread between prices of Treasury Securities in the when-issued market and at those sold at auction, Defendants were able reap supracompetitive profits, essentially shorting (selling) Treasury Securities at artificially high prices in the when-issued market and then buying Treasury Securities to cover those short positions at artificially low prices in the Treasury Department auction.

62.     Through Defendants' collusion and unlawful conduct, Defendants were able to keep the spread between when-issued and auction prices at supracompetitive levels that would

---

[3] *See, e.g.,* Kevin Dugan, *Justice Department Probes Banks for Rigging Treasuries Market*, NEW YORK POST, June 8, 2015; Owen Davis, *Banks Probed Over Treasury Market Manipulation*, INTERNATIONAL BUSINESS TIMES, June 8, 2015; Keri Geiger and Matthew Leising, *Treasuries Collusion Said to Be Hunted in New Wave of Probes*, BLOOMBERG BUSINESS, June 10, 2015.
[4] Keri Geiger, Daniel Kruger, and Alexandra Scaggs, *As U.S. Probes $12.7 Trillion Treasury Market, Trader Talk is a Good Place to Start*, BLOOMBERG BUSINESS, June 24, 2015.
[5] *Id.*

otherwise not have been possible in a truly competitive market.  This collusion among Defendants enabled them to take positions in the Treasury Securities market that often swayed prices of trillions of dollars in bonds at the expense of the Class.

63.    In addition, because the prices at auction and in the when-issued market heavily influence prices in the secondary market, which in turn are key metrics (such as rates) for determining the price of other Treasury Instruments, Defendants' collusive conduct also affected the secondary market for Treasury Securities and markets for Treasury Instruments, leading to artificial pricing in these affected markets.

**CERTAIN DEFENDANTS HAVE A HISTORY OF
COLLUDING TO MANIPULATE FINANCIAL MARKETS**

64.    Certain of the Defendants have a history of colluding to manipulate other financial markets.  Indeed, Defendants' conduct in this case is part of a larger set of revelations emerging about manipulation and collusion in connection with financial benchmarks and the financial instruments tied to those benchmarks.

65.    For example, in May 2015 the DOJ, in conjunction with non-DOJ regulators, extracted an unprecedented string of guilty pleas from major financial institutions – including certain Defendants (or their parent companies) – for violating federal antitrust laws by colluding, for over five years, to rig the $5.3 trillion-a-day foreign-exchange ("FX") benchmarks at the global economy's center.[6]  The DOJ has so far recovered more than $10 billion in fines from financial institutions, including approximately $2.38 billion from Barclays PLC, $1.27 billion from Citigroup, $892 million from JPMorgan Chase & Co., $669 million from The Royal Bank of Scotland PLC, and $545 million from UBS AG.[7]  Using names such as "The Cartel" and "The

---

[6] Owen Davis, *Major Banks Slapped With $5.7 Billion in Fines, Unprecedented Criminal Charges Over Foreign Exchange Manipulation*, INTERNATIONAL BUSINESS TIMES, May 20, 2015.
[7] *Id.*

Mafia," the groups colluded to place last-minute trades that would move rates in ways profitable to them.[8]   Traders at these banks met regularly in electronic chat rooms minutes before global currency benchmarks were set to swap confidential information, including details about their customers' orders.[9]   This investigation is ongoing against several conspirators.

66.     Also in May 2015, the U.S. Commodity Futures Trading Commission ("CFTC") settled with Barclays PLC for $115 million for allegations that it attempted to rig ISDAFIX, a benchmark for interest-rate swaps, over a five year period.[10]   ISDAFIX is calculated daily at a specific time based on banks' quotations for the rate at which they would buy or sell a reference swap of a specific nominal value.   Traders at Barclays PLC were implicated in a scheme to buy or sell heavily immediately before ISDAFIX's daily calculation with the goal of moving the rate in a desired direction.   This investigation remains ongoing against several conspirators in the financial industry.

67.     In April 2015, Deutsche Bank settled with several U.S. and international regulators for $2.5 billion over alleged collusion with respect to LIBOR.   Calculated daily by a banking-trade-association panel based on the banks' submissions of rates intended to reflect their anticipated cost of borrowing U.S. dollars from other banks, LIBOR is a crucial daily interest rate benchmark in financial markets. Deutsche Bank, along with several other Defendants or affiliates of Defendants in this action—Barclays PLC, The Royal Bank of Scotland, and UBS AG—was implicated in an intra-bank conspiracy to report rates that did not reflect good-faith estimates of their borrowing costs, submitting instead artificial rates over the course of nearly

---

[8] *Id*.
[9] *Id*.
[10] Matthew Leising, *The E-Mail That Helped Catch Barclays: 'ISDAfix Is Manipulated'*, BLOOMBERG BUSINESS, MAY 20, 2015.

three years to fix LIBOR at a rate that would benefit these Defendants at the expense of their counterparties.

**DEFENDANTS FRAUDULENTLY CONCEALED THEIR MISCONDUCT**

68.     Defendants and their co-conspirators concealed their wrongdoing in manipulating the prices of Treasury Securities in the when-issued market and at the Treasury Department auctions.   Accordingly, the statute of limitations relating to the claims for relief alleged below were tolled due both to Defendants' affirmative acts of concealment and the inherently self-concealing nature of their private, unregulated conduct.

69.     Defendants and their co-conspirators were able to conceal their collusion because of their control over the market for U.S. Treasury Securities due in part to their roles as Primary Dealers in this market.   Neither Plaintiff nor Class members knew of Defendants' and their co-conspirators' unlawful and self-concealing conduct and could not have discovered them by the exercise of reasonable due diligence.   Defendants and their co-conspirators' conduct concerning their manipulation was so well hidden that Defendants and their co-conspirators kept U.S. regulators unaware of such conduct for years.

70.     Only after recent public reports disclosed DOJ's investigation of the Treasury Securities market did Plaintiff have a sufficient basis to investigate possible manipulation of the Treasury Securities market by Defendants and their co-conspirators.

71.     Reasonable due diligence could not have uncovered Defendants' and their co-conspirators' manipulative conspiracy because: (i) the Treasury Department auctions were held out as being set by an impartial auction based on market factors; (ii) Defendants' bids in the Treasury Department auctions are secretive and not publicly available; (iii) Defendants' and their co-conspirators' trading positions and trading strategies in the when-issued market are not

publicly available; (iv) the bilateral, non-exchange traded nature of when-issued market transactions makes it difficult to observe anti-competitive or manipulative behavior in that market; (v) the highly specialized and esoteric nature of the different aspects of the U.S. Treasury Securities market makes it extraordinarily difficult for an ordinary person to assess improprieties; and (vi) neither Defendants nor their co-conspirators told Plaintiff or other class members that they were conspiring to fix, stabilize, maintain, or otherwise manipulate the prices of U.S. Treasury Securities during the when-issued market or at Treasury Department auctions.

72.     Defendants and their co-conspirators also took active steps to conceal evidence of their misconduct from Plaintiff, class members, regulators, and the public, including: (i) holding out their activities in the when-issued market and at auction as good faith market-making conduct; (ii) maintaining the secrecy of their price-fixing scheme; (iii) avoiding any discussion in the public forum of their collusive activities and manipulation of the when-issued market and Treasury Department auctions; and (iv) using non-public proprietary electronic communication platforms (e.g., instant messaging, electronic chatrooms, etc.) to coordinate trading strategies in the when-issued market and at auction.

73.     In addition, Defendants and their co-conspirators failed to have the proper internal controls in place to detect misconduct concerning the manipulation of the U.S. Treasury Securities market, making detection all the more difficult.

74.     As a result of Defendants' and their co-conspirators' affirmative steps to conceal their improper conduct; their willful decision not to put in place proper controls to detect improper conduct; the self-concealing nature of the price-fixing conspiracy; and the resulting lack of public information about material aspects of the conspiracy, collusion, and trading based on nonpublic information, the statutes of limitations was tolled for Plaintiff's claims.

## CLASS ACTION ALLEGATIONS

75.     Plaintiff brings this class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) and (b)(3), on its own behalf and as a representative of all persons or entities who transacted in any Treasury Instrument, excluding Defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this Complaint, and the U.S. government (the "Class").

76.     Plaintiff believes that there are at least thousands of Class Members, making the Class so numerous and geographically dispersed that joinder of all Class Members is impracticable.

77.     Common questions of law and fact exist as to all of the Class.  This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all of the Class, thereby making appropriate relief with respect to the Class as a whole.  Such common questions of law and fact include, without limitation, the following:

a.      Whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, stabilize, and/or otherwise manipulate the prices for Treasury Instruments in violation of the Sherman Act and/or Commodity Exchange Act;

b.      The identity of the participants in the conspiracy;

c.      The duration of the conspiracy;

d.      The nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

e.      Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the Class Members;

f.      Whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiff and the Class Members;

g.      The appropriate injunctive and equitable relief for the Class; and

h.      The appropriate measure of damages sustained by Plaintiff and the Class Members.

78.     Plaintiff's claims are typical of the claims of the other Class Members.  Plaintiff and Class Members sustained damages arising out of Defendants' common course of conduct in violation of law as complained of herein.  The injuries and damages of each Class Member were directly caused by Defendants' wrongful conduct in violation of the laws as alleged herein.

79.     Plaintiff will fairly and adequately protect the Class Members' interests.  Plaintiff is an adequate representative of the Class and has no interests adverse to absent Class Members' interests. Plaintiff has retained counsel competent and experienced in class action litigation, including antitrust and commodities class-action litigation.

80.     The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications.

81.     The questions of law and fact common to the Class Members predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

82.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of

similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without duplication of effort and expense that numerous, separate individual actions, or repetitive litigation, would entail.  The Class is readily definable and is one for which records should exist in the files of Defendants and their co-conspirators, Class Members, or the public record.  Class treatment will also permit the adjudication of relatively small claims by many Class Members who otherwise could not afford to litigate the claims alleged herein, including those for antitrust violations.  This class action presents no difficulties of management that would preclude its maintenance as a class action.

## FIRST CLAIM FOR RELIEF

### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1
### Agreements Restraining Trade

83.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

84.     Defendants and their unnamed co-conspirators entered into and engaged in a combination and conspiracy that was an unreasonable and unlawful restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*

85.     During the Class Period, Defendants entered into an agreement to reduce competition amongst themselves by fixing and/or manipulating Treasury Security prices before and during Treasury auctions and, as a result, the prices of Treasury Securities.

86.     This conspiracy to manipulate Treasury Securities prices and the benchmark price caused injury to both Plaintiff and the Class by depriving them of the benefit of accurate Treasury Securities prices reflecting true market conditions for some period during and following Defendants' unlawful conduct, and thus Plaintiff and the Class received, upon execution of their trades, less in value than they would have received absent Defendants' wrongful conduct.

87.     The conspiracy is a *per se* violation of Section 1 of the Sherman Act. Alternatively, the conspiracy resulted in substantial anticompetitive effects in the Treasury markets.  There is no legitimate business justification for, or pro-competitive benefits from, Defendants' conduct. Furthermore, any business justification is outweighed by the anticompetitive effects of Defendants' conduct.

88.     As a direct and proximate result of Defendants' violation of Section 1 of the Sherman Act, Plaintiff and the Class have been injured in their business and property, within the meaning of Section 4 of the Clayton Act, 15 U.S.C. §15(a), throughout the Class Period.

89.     Plaintiff and the Class are entitled to treble damages for the violations of the Sherman Act alleged herein, pursuant to Section 4 of the Clayton Act, 15 U.S.C. §15(a). Plaintiff and the Class are also entitled to injunctive and other equitable relief, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

## SECOND CLAIM FOR RELIEF

**Violation of 7 U.S.C. §§ 1 *et seq*.**
**Manipulation In Violation of The Commodity Exchange Act,**
**Including CFTC Rule 180.2**

90.     Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

91.     By their intentional misconduct, Defendants and their co-conspirators each violated Sections 6(c)(3) and 9(a)(2) of the Commodity Exchange Act (the "CEA"), 7 U.S.C. §§ 9(3), 13(a)(2), and CFTC Rule 180.2 adopted under the CEA ("Rule 180.2") and caused prices of exchange-traded Treasury futures and options and over-the-counter Treasury forwards and options to be artificial during the Class Period.

92.     Defendants' and their co-conspirators' trading and other activities alleged herein constitute market power manipulation of the prices of exchange-traded Treasury futures and

options and over-the-counter Treasury forwards and options in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a) and 25(a), and Rule 180.2.

93.     Defendants' and their co-conspirators' manipulation deprived Plaintiff and the Class of a lawfully operating market during the Class Period.

94.     Plaintiff and others who transacted in exchange-traded Treasury futures and options and over-the-counter Treasury forwards and options during the Class Period transacted at artificial and unlawful prices resulting from Defendants' and co-conspirators' manipulation in violation of the CEA, 7 U.S.C. § 1, et seq., and Rule 180.2, and as a direct result thereof were injured and suffered damages. Plaintiff and each Class Member sustained and are entitled to actual damages for the violations of the CEA alleged herein.

### THIRD CLAIM FOR RELIEF

### Violation of 7 U.S.C. §§ 1 *et seq*.
### Employment of Manipulative or Deceptive Device
### or Contrivance In Violation of The Commodity Exchange Act,
### Including CFTC Rule 180.1

95.     Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

96.     By their intentional misconduct, Defendants and their co-conspirators each violated Sections 6(c)(1) and 9(a)(2) of the Commodity Exchange Act (the "CEA"), 7 U.S.C. §§ 9(1), 13(a)(2), and Rule 180.1 and caused prices of exchange-traded Treasury futures and options and over-the-counter Treasury forwards and options to be artificial during the Class Period.

97.     Defendants' and their co-conspirators' trading and other activities alleged herein constitute market power manipulation of the prices of exchange-traded Treasury futures and options and over-the-counter Treasury forwards and options in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a) and 25(a), and Rule 180.1.

98.     In violation of CEA Section 6(c)(1) and Rule 180.1 Defendants and co-conspirators also caused to be delivered for transmission false or misleading or inaccurate reports in connection with the Treasury Department auctions by fixing the bids during these auctions, thereby causing them to reflect artificial, non-competitive pricing for these securities. Defendants and their co-conspirators did so either knowingly, intentionally, or acting in reckless disregard of the fact that such reports were false, misleading, or inaccurate.  Defendants also violated CFTC Rule 180.1 by deceiving their customers in the when-issued market through the sale of price-fixed when-issued Treasury Securities. Customers in the when-issued market had a reasonable expectation that the prices of when-issued Treasury Securities are reflective of natural market forces.   By selling price-fixed Treasury Securities to their unwitting customers, Defendants undermined their customers' reasonable expectations of a fair marketplace free from manipulation and collusion.

99.     Defendants' and their co-conspirators' manipulation deprived Plaintiff and the Class of a lawfully operating market during the Class Period.

100.    Plaintiff and the others who transacted in exchange-traded Treasury futures and options and over-the-counter Treasury forwards and options during the Class Period transacted at artificial and unlawful prices resulting from Defendants' and co-conspirators' manipulations in violation of the CEA, 7 U.S.C. § 1, *et seq*., and Rule 180.1, and as a direct result thereof were injured and suffered damages. Plaintiff and each Class Member sustained and are entitled to actual damages for the violations of the CEA alleged herein.

## FOURTH CLAIM FOR RELIEF

### Violation of 7 U.S.C. §§ 1 *et seq*.
### Principal-Agent Liability In Violation of
### The Commodity Exchange Act

101.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

102.    Each Defendant is liable under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

103.    Plaintiff and each Class Member are entitled to actual damages for the violations of the CEA alleged herein.

## FIFTH CLAIM FOR RELIEF

### Violation of 7 U.S.C. §§ 1 *et seq*.
### Aiding And Abetting Liability In Violation of
### The Commodity Exchange Act

104.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

105.    Defendants and their co-conspirators knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein. Defendants did so knowing of each other's and their co-conspirators' manipulation of the Treasury Securities market, and willfully intended to assist these manipulations, which resulted in Treasury futures and options pricing becoming artificial during the Class Period in violation of Sections 13 and 22(a)(1) of the CEA, 7 U.S.C. §§ 13c(a), 25(a)(1).

106.    Plaintiff and each Class Member are entitled to actual damages for the violations of the CEA alleged herein.

## SIXTH CLAIM FOR RELIEF

### Unjust Enrichment

107.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

108.    Because of the acts of Defendants and their co-conspirators as alleged herein, Defendants have been unjustly enriched at the expense of Plaintiff and the Class.

109.    Permitting Defendants to retain profits earned by manipulation of the Treasury Securities market would violate established principles of equity and good conscience.

110.    Plaintiff and Class Members transacted in Treasury Securities directly with Defendants in the when-issued market. By virtue of Defendants' manipulation of these when issued Treasury Securities, Plaintiff and Class Members were deprived the benefits of a fair market, free from collusion and manipulation. Defendants reaped millions of dollars in profits at the expense of Plaintiff and Class Members as result of their misconduct.

111.    Furthermore, the Treasury derivatives market, which includes Treasury futures and options, are effectively a zero-sum game, meaning that when one individual gains money in a particular transaction, another must lose money on that same transaction.  As a direct and foreseeable consequence of Defendants' manipulation of the Treasury Securities market, Defendants were able to reap millions of dollars in profits at the expense of Plaintiff and Class Members, through the sale of Treasury Instruments, including Treasury futures and options traded on the CME.

112.    Accordingly, Plaintiff and the Class seek restoration of the monies of which they were unfairly and improperly deprived, as described herein, by way of transactions for the sale or purchase of Treasury Instruments entered into with Defendants or their co-conspirators.

## SEVENTH CLAIM FOR RELIEF

### Breach of the Implied Covenant of Good Faith and Fair Dealing

113.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

114.    Defendants and members of the Class entered into bilateral contracts for the purchase and/or sale of Treasury Securities in the when-issued and secondary markets, and of Treasury Instruments such as Treasury futures and options traded on the CBOT.  Implied in these agreements were covenants that the counterparties would deal with each other in good faith and would not engage in any conduct to deprive the other of the benefits of their respective agreements.  Also implied was a promise by the Defendants, as primary dealers in Treasury Securities and market makers for both Treasury Securities and Treasury Instruments, that the price of the Treasury Securities and Treasury Instruments would not be manipulated to the Defendants' benefit and Class members' detriment.

115.    Defendants failed to perform their obligations in good faith under these agreements by knowingly, intentionally, and secretly conspiring to manipulate Treasury Securities to either reduce the payments they would have to make or to increase the payments they were entitled to receive at the expense of plaintiffs and Class members.  At the very least, Defendants acted with reckless disregard for the interests of plaintiffs and Class members.

116.    As Defendants knew, their manipulation of the prices of Treasury Securities and Treasury Instruments deprived plaintiffs and Class members of the benefit of their bargain.  Had the Defendants not engaged in such manipulation, plaintiff's and Class members' transactions in Treasury Securities and Treasury Instruments would have been more profitable or losses on those transactions would have been lower.  As a direct and proximate result of Defendants' knowing, intentional, and bad faith violation of their agreements' implied covenants of good

faith and fair dealing, plaintiffs and members of the Class have suffered damages in an amount to be determined at trial. Plaintiffs and members of the Class seek all losses caused by Defendants' manipulation, including loss of interest, lost profits, and all losses on their Treasury Securities, Treasury Instruments, and other financial instruments that they transacted in with Defendants.

## PRAYER FOR RELIEF

117. WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. The Court certifies this action as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure and appoints Plaintiff as Class Representative for the Class and its counsel of record as Class Counsel;

B. The unlawful conduct alleged herein be adjudged and decreed to violate Section 1 of the Sherman Act;

C. Plaintiff and the Class recover damages, to the maximum extent allowed under federal antitrust laws, and that a joint and several judgment in favor of Plaintiff and the Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

D. Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E. The Court determines that Defendants violated the CEA and award appropriate damages;

F.      Plaintiff and the Class recover their costs of suit, including reasonable attorneys'

fees, as provided by law; and

G.      Plaintiff and the Class have such other and further relief as the case may require

and the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff demands a trial by jury, pursuant to Federal Rule of Civil Procedure 38(b), of all

issues so triable.

Dated: October 28, 2015
New York, New York                          **ABRAHAM, FRUCHTER & TWERSKY, LLP**

By _/s/ Mitchell M.Z. Twersky_____
Mitchell M.Z. Twersky (MT-6739)
Jeffrey S. Abraham (JA-2946)
One Penn Plaza, Suite 2805
New York, New York 10119
Tel:    (212) 279-5050
Fax:    (212) 279-3655
*mtwersky@aftlaw.com*
*jabraham@aftlaw.com*
*Counsel for Plaintiff University of Puerto Rico Retirement System*